## Case No. 11,274.

### POPE et al. v. NICKERSON et al.

[3 Story, 465; 7 Law Rep. 471; 12 Hunt. Mer. Mag. 179.][1]

Circuit Court, D. Massachusetts.    Oct. Term, 1844.

SHIPPING — ACCOUNTING BETWEEN SHIPPER AND OWNER—SALE OF CARGO IN FOREIGN PORT FOR REPAIRS—PERISHABLE ARTICLES — BOTTOMRY — GENERAL AVERAGE—AUTHORITY OF MASTER.

1. The schooner Annawan, bound from Malaga to Philadelphia, and owned in Massachusetts, having on board a cargo of fruit and wine, was obliged from stress of weather, to put into Bermuda, where she was surveyed and repaired, and the damaged part of the cargo was sold, and the proceeds appropriated to the payment of the repairs, and the balance required for the repairs was raised on a bottomry bond, on the vessel, freight, and cargo. The vessel then proceeded with the remainder of the cargo, and some copper on freight, and was again forced, by stress of weather, to put back to Bermuda, where, after a survey, the captain sold the vessel and the whole cargo, and with the proceeds paid the whole money on the bottomry bond, and detained the balance. The vessel was subsequently repaired, and brought to Philadelphia, with the sound part of the cargo. The present action is brought by the shippers, to recover the whole cargo. It was *held,* that the responsibility of the owners of the schooner is governed by the laws of Massachusetts, where the owners reside, and not of Pennsylvania, or Spain.

[Cited in Hatton v. Melita, Case No. 6,218; The Brantford City, 29 Fed. 384; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 449, 454, 9 Sup. Ct. 475, 477.]

[Cited in brief in Dyke v. Erie Ry. Co., 45 N. Y. 114.]

2. The defendants are liable personally to the plaintiffs, for the monies of the shipper appropriated by the master towards the repairs of the ship, before the bottomry bond was given.

3. The defendants are not liable to the plaintiffs for the monies subsequently applied by the master to the payment of the bottomry bond; nor for the wrongful act of the master in selling the sound part of the cargo.

[Cited in brief in Drummond v. Winslow, 38 Me. 208.]

4. The sale of the perishing articles, and the appropriation of the proceeds thereof, to the repairs of the ship, was justifiable; but the sale of the sound part of the cargo was unjustifiable, and the master is responsible for the proceeds of such sale to the shippers.

[Cited in brief in Stirling v. Nevassa Phosphate Co., 35 Md. 132. Cited in Walker v. Boston & Hope Ins. Co., 14 Gray, 304.]

5. No general average is now, in this case, due to the defendants; but the general average should be applied pro tanto, as property of the ship-owners, in relief of the owners of the cargo, towards the bottomry bond.

[Cited in Hassam v. St. Louis Perpetual Ins. Co., 7 La. Ann. 11.]

6. By the laws of Spain, and of Massachusetts, the liability of the owners for the acts of the master is limited to the value of the vessel, and her freight, and does not include a general liability to the full extent of the loss or damage to the shippers, as by the laws of Pennsylvania.

[Distinguished in Faulkner v. Hart, 82 N. Y. 420.]

7. The master of a vessel has no power to bind the owners beyond the authority given to him by them, and the extent of that authority must be limited to their express or implied instructions, or to the law of the country, to which the ship belongs, and in which they reside.

[Cited in The Woodland, Case No. 17,976; The New World v. King, 16 How. (57 U. S.) 473; The Maggie Hammond, 9 Wall. (76 U. S.) 450; The William Cook, 12 Fed. 920; Force v. Providence Washington Ins. Co., 35 Fed. 779; The Scotia, Id. 908, 912; Card v. Hine, 39 Fed. 821; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 449, 454, 9 Sup. Ct. 475, 477.]

[Cited in Holcroft v. Halbert, 16 Ind. 257; Stirling v. Nevassa Phosphate Co., 35 Md. 140; Botsford v. Plummer, 67 Mich. 270, 34 N. W. 572; King v. Sarria, 69 N. Y. 33.]

8. The validity, nature, and interpretation of contracts, is governed by the law of the place where they are to be performed; unless they are void by the law of the place where they are made.

[Cited in Morrison v. The Unicorn, Case No. 9,849; The Avon, Id. 680.]

[Cited in brief in Talbott v. Merchants' Desspatch Transp. Co., 41 Iowa, 248, 249. Cited in Barter v. Wheeler, 49 N. H. 29; Dickinson v. Edwards, 77 N. Y. 587; Faulkner v. Hart, 82 N. Y. 420.]

9. The cases of Malpica v. McKown, 1 La. 248, and of Arayo v. Currel, Id. 528, commented upon.

10. Bottomry bonds are not to be construed strictly, but liberally, so as to carry into effect the intention of the parties.

[Cited in Greely v. Smith, Case No. 5,750.]

11. The holder of a bottomry bond will not lose his money, where the non-performance of the voyage has not been occasioned by the enumerated perils, but has arisen from the fault or misconduct of the master or owner.

[Cited in Morrison v. The Unicorn, Case No. 9,849.]

12. In cases of bottomry, a loss, not strictly total, cannot be turned into a technical total loss, by abandonment, so as to excuse the borrower from payment; even although the expense of repairing the ship exceeds her value.

[Cited in Delaware Mut. Safety Ins. Co. v. Gossler, 96 U. S. 653.]

13. The master of a vessel has a right to sell a part of the cargo to make repairs, or to furnish necessaries for the completion of the voyage, and, by the general law in England and America, the owner would be responsible therefor to the shipper for the full amount, whatever it might be. It seems, that this rule would only apply, in case the vessel arrived at her port of destination, and not otherwise.

[Cited in Joy v. Allen, Case No. 7,552; Morrison v. The Unicorn, Id. 9,849.]

14. The only operation of the statute in Massachusetts on this rule, is to restrict the liability of the owners to the value of the ship and freight. But the shippers have a personal claim, and a lien therefor on the ship and freight, which attaches the moment the goods are appropriated.

[Cited in The Champion, Case No. 2,583.]

[Cited in Walker v. Hope Ins. Co., 14 Gray, 301.]

15. The statute of Massachusetts has reference only to cases where the master is guilty of tort or misconduct,—and not to cases of contracts by the master made lawfully, and within the scope of his authority.

[Cited in Walker v. Hope Ins. Co., 14 Gray, 304.]

---

[1] [Reported by William W. Story, Esq. Law Rep. 471, and 12 Hunt, Mer. Mag. 179, contain only partial reports.]

16. The master has no right to sell the cargo, or any portion thereof, unless in case of a moral necessity, in order to prevent a greater loss to the shippers.

[Cited in Fitz v. The Amelie, Case No. 4,838; Astsrup v. Lewy, 19 Fed. 541.]

[Cited in Prince v. Ocean Ins. Co., 40 Me. 481.]

Assumpsit. The parties agreed upon the following statement of facts: "This is an action of assumpsit on four bills of lading, signed by the master of the schooner Annawan, belonging to the defendants [Thomas Nickerson and others] for a cargo of fruit and wine, shipped on board of her at Malaga, and consigned to the plaintiffs [Daniel Pope and others] at Philadelphia. The vessel, being seaworthy, sailed from Malaga on the 10th of October, 1840, and having experienced severe weather, by which she sustained damage on the 28th of November, the master decided, for the preservation of the vessel and cargo, to run for the nearest port, and arrived at St. George's, Bermuda, on December 5th. On her arrival a survey was held on the vessel and cargo. The former was ordered to be repaired, and such parts of the latter as were damaged, and in a perishable condition, were ordered to be sold. Such sale was accordingly made, and the proceeds, amounting to $1,029.70, were appropriated by the master towards defraying the expenses of the repairs. For the residue of the amount necessary for that purpose, the master procured funds by a bottomry bond, viz. $1,828.75. The bond recites in the preamble a necessity for hypothecating both vessel, freight and cargo, but only the vessel is named in the obligating part. The lender testifies, that it was the intention to include the cargo. The repairs being completed, the vessel took on board such of the cargo as had not been sold, and some copper on freight, and sailed for Philadelphia on February the 4th, 1841. She again encountered severe weather and lost a foremast, maintopmast, and jibboom, so that it was necessary to cut away every thing, to get clear of the wreck, and she was obliged to put back to Bermuda, where she arrived on the 18th. She was again surveyed, and an estimate made of the expenses of repairs, upon which the master concluded not to repair her, but to abandon the vessel and cargo, and to sell them. A survey was held on the cargo, in which it was ascertained, that part of the cargo, which consisted of fruit, was generally heated, and in a perishable condition; and the surveyors recommended, that it should be sold, —which was accordingly done. The master, having sold the vessel, concluded to sell the wine also, which was done. The proceeds of the vessel were applied to the payment of the bond, and being insufficient for its satisfaction, the agents of the vessel appointed by the master, who also were the holders of the bond, took the residue of the proceeds of the cargo; and the balance, amounting to about $1,800, was paid to the master. The vessel was not insured, and the master was

not interested therein. The sum received by him has been retained by him, he declining to pay it to the owners of the cargo, unless they would give a receipt in full, releasing both him and the owners of the vessel from all further demands, and the owners of the vessel declining to receive it, on the ground that they had no interest in it. The plaintiffs claim the whole of the cargo shipped at Malaga. The defendants deny that, under the circumstances, they are liable at all, but contend, that, if liable at all, they are only liable for the actual proceeds of the cargo after deducting its contributary proportion thereof to all the expenses and charges incurred in general average. The writ, protest, surveys, bottomry bond, invoice accounts of Foyard and Smith, the vessel's agents at Bermuda, depositions taken there, bills of lading and statements of general average, form a part of the case for the use of either party. The case is submitted to the court to decide, whether the defendants are liable, and if so, on what principles the damages are to be assessed; and, if necessary, the cause may be sent to an auditor to ascertain the amount. Costs follow the result. Neither party is precluded by the statement from referring to any other fact appearing on the other papers of the case."

The bottomry bond referred to in the statement was as follows:

"These are to certify to all whom it may concern, that on the day of the date hereof, personally appeared before me, the consul aforesaid, John Scott Fisher, of the town of Saint George in the said islands of Bermuda, merchant, the deponent named in the affidavit hereunto annexed, being a person well known, and worthy of good credit, and by solemn oath which the said defendant then took before me upon the Holy Evangelists of Almighty God, did solemnly and sincerely testify and depose to be true, the several matters and things mentioned and contained in the said annexed affidavit. In testimony whereof I, the consul aforesaid, have caused my seal of office to be hereunto put and affixed, and also the bond mentioned in the said affidavit to be hereunto annexed; dated at the town of Saint George in the islands of Bermuda aforesaid, the second day of February, in the year of our Lord one thousand eight hundred and forty-one."

"John Scott Fisher, of the town of Saint George in the islands of Bermuda, merchant, maketh oath and saith, that he was present and did see Isaiah Atkins, master of the American schooner or vessel called the 'Annawan' now lying in the harbor of Saint George in the said islands, duly sign and seal, and as his act and deed deliver the bottomry bond hereunto annexed, bearing date the second day of February in the year of our Lord one thousand eight hundred and forty-one. And that the name 'Isaiah Atkins' thereunto set as the name of the party executing the same is of the proper handwriting of him

the said Isaiah Atkins, and that the names 'William Arthur Outerbridge' and 'John Scott Fisher,' respectively set or subscribed as witnesses to the execution of the said bottomry bond, are of the proper handwriting of the said John Scott Fisher and of the said William Arthur Outerbridge respectively. John Scott Fisher."

"Know all men by these presents that I, Isaiah Atkins, of Provincetown, state of Massachusetts, in the United States of America, master of the American schooner or vessel called the 'Annawan,' of the burthen of one hundred and twenty-three tons and fifty ninety-fifth parts of a ton, or thereabouts, belonging to Thomas Nickerson, Ebenezer Atkins, Jonathan Nickerson, Abraham Smalley, Isaac Smalley, Robert P. Miller, Stephen Nickerson, and Samuel Soper of Provincetown aforesaid, in the state of Massachusetts aforesaid, and now riding at anchor in the port of Saint George in the said islands of Bermuda, am held and firmly bound unto Augustus John Foyard, and Samuel Satton Smith, of the town of Saint George in the islands aforesaid, merchants, in the sum of four thousand and twenty-three dollars and fifty eight cents, to be paid to the said Augustus John Foyard and Samuel Satton Smith, or either of them, their or either of their certain attorneys or attorney, executors, administrators or assigns. For which payment to be well and truly made, I the said Isaiah Atkins do bind myself, my heirs, executors and administrators and every of them, and also the hull and appurtenances of the said schooner or vessel, firmly by these presents, sealed with my seal, dated this second day of February, in the year of our Lord one thousand eight hundred and forty-one. Whereas the said schooner or vessel called the 'Annawan' was, on or about the fifth day of December last past, whilst on a voyage from Malaga in Spain to Philadelphia in the United States of America, with a cargo of fruits and wines, forced and obliged by the perils of the sea to put into the port of Saint George in distress, and being thereupon found to be generally damaged and to require considerable repairs and supplies for the continuance and prosecution of the said voyage, the above bounden Isaiah Atkins hath been obliged and necessitated to take up and borrow upon the adventure of the said schooner or vessel, and the cargo on board thereof, the sum of one thousand eight hundred and twenty-eight dollars and seventy-five cents, being part of the amount required for repairing and furnishing the said schooner or vessel with materials, provisions and other necessaries, and setting her forth to sea to prosecute the said voyage, which said sum of one thousand eight hundred and twenty-eight dollars and seventy-five cents, the said Augustus John Foyard and Samuel Satton Smith have, at the request of the said Isaiah Atkins, lent and advanced to him the said Isaiah Atkins for the purpose aforesaid, at and after the rate of one hundred and ten dollars for every one hundred dollars of the said sum so advanced, being equal to the sum of two thousand and eleven dollars and seventy-nine cents, to be paid for the said sum of one thousand eight hundred and twenty-eight dollars and seventy-five cents, so lent and advanced for the said voyage. And the said Augustus John Foyard and Samuel Satton Smith are contented and have agreed to stand to and bear the hazard and adventure thereof on the hull or body and keel of the said schooner or vessel, and the goods, merchandize and effects, laden on board thereof, for and during the said voyage; and, therefore, the said Isaiah Atkins doth by these presents mortgage and hypothecate to the said Augustus John Foyard and Samuel Satton Smith and each or either of them, their and each or either of their executors, administrators and assigns, the said schooner or vessel called the 'Annawan,' with all her boats, tackle, apparel and furniture, and also the cargo, merchandize and effects laden on board thereof for the said voyage. Now the condition of the above written obligation is such, that if the said schooner or vessel called the 'Annawan' do and shall, with all convenient speed, proceed and sail from and out of the said port of Saint George, on her said voyage, and arrive at Philadelphia aforesaid, there to end her intended voyage, without deviation except by the dangers and casualties of the sea and rivers, and also if the above bounden Isaiah Atkins, his heirs, executors or administrators do and shall within the space of three days next after the arrival of the said schooner or vessel at Philadelphia aforesaid, or at any other port in the United States of America, well and truly pay, or cause to be paid, unto the said Augustus John Foyard and Samuel Satton Smith or to either of them or to their or either of their certain attorneys or attorney, executors or assigns the full sum of two thousand and eleven dollars and seventy-nine cents—or if a certain set of bills of exchange, drawn by the said Isaiah Atkins on the day of the date of these presents for the last mentioned sum of money upon Messrs. Pope and Aspinwall of Philadelphia, in favor of the said Augustus John Foyard and Samuel Satton Smith, as a collateral security only for the said sum of money so advanced as aforesaid, shall, within three days after the arrival of the said schooner or vessel at Philadelphia aforesaid, be duly paid, or after her arrival at any other port in the United States of America, the same be duly paid,—or if in the said voyage an utter loss of the said schooner or vessel by fire, enemies, pirates or any other casualty shall unavoidably happen (to be sufficiently proved by the said Isaiah Atkins his heirs, executors or administrators). Then the above written obligation shall be null and void, or else shall be and remain in full force and virtue. In witness whereof the said Isaiah Atkins hath set his hand and seal to two bonds of the same tenor and date, one of which being paid, the other to be null and void. Isaiah Atkins."

The bills of lading were drawn at Malaga, and contained divers shipments by different shippers at Malaga, in Spain, consigned to the plaintiffs Messrs. Pope and Aspinwall and deliverable at the port of Philadelphia to the consignees, "the act of God, the king's enemies, fire, all and every accident of the seas and navigation excepted."

The other papers, bearing only incidentally upon the question at issue, are not deemed necessary to be referred to at large in this place; as their bearings are sufficiently suggested in the arguments of the counsel and the opinion of the court.

E. H. Derby, for plaintiffs.
F. C. Loring, for defendants.

STORY, Circuit Justice. This case has been argued with great care, ability, and bearing by the counsel on each side, and all the appropriate topics have been by them brought under discussion, and indeed exhausted. In the views, which I have taken of the present case, I shall not deem it necessary to consider some of the points suggested at the bar; but shall content myself with an exposition of those, which in my judgment constitute the main grounds upon which the case must be determined.

The first point, which meets us at the threshold of the case, is as to the nature and extent of the liability of the defendants (the owners of the schooner) for the acts of the master. The bills of lading, upon which the original shipments were made, were executed at Malaga; the goods were consigned and to be delivered to the plaintiffs (the consignees) at Philadelphia; the schooner belonged to Massachusetts, and her owners resided there. It is not denied, that the vessel was a freighting vessel, and that the master was duly authorized to take the present shipments on board for the voyage. Whether the schooner was a common carrier, that is, a general carrier vessel whose mere employment was to take goods on board for hire for any persons whatever, or whether she was simply a carrier vessel employed on the present voyage pro hac vice, has been much discussed at the bar. But in my judgment, nothing does in this case turn upon any distinction between the cases; for under the bills of lading precisely the same obligations attach to the owners and the master in regard to the shippers—whether she was a general or common carrier, or simply a carrier pro hac vice. The bills of lading ascertain, and fix and control the liability, and the exceptions therein contained cover the usual risks, not taken by the owners.

It is under these circumstances, that a question has been made at the bar, by what law the present bills of lading are to be governed as to their obligation and extent upon the owners, whether by the law of Spain, where the contracts of shipment were made, or by the law of Pennsylvania, where the goods were to be delivered, or by the law of Massachu-

setts, where the owners reside, and to which the vessel belonged. And this point seems the more important to be decided, inasmuch as the liability of the owners for the acts, torts and misconduct of the master and mariners is by the law of Spain (Codigo de Commercio, promulgated in May, 1829, art. 622), and also by the law of Massachusetts (Rev. St. Mass. 1835, Ed. 1836, p. 295, c. 32, § 1), limited to the value of the vessel and her freight, and does not include a general liability to the full extent of the loss or damage sustained by the shippers, as is the law of Pennsylvania (see Del Col v. Arnold, 3 Dall. [3 U. S.] 333; The Amiable Nancy, 3 Wheat. [16 U. S.] 545; Abb. Shipp., Am. Ed. 1829, pt. 2, pp. 90–99, c. 2, §§ 1–11, and note 1; Id. pt. 3, pp. 263–269, c. 5, §§ 7–9), which in this respect follows the law of England as it was before the limitations prescribed by the acts of parliament (Story, Confl. Laws, §§ 242, 260, 263, 266, 270, 290). Questions of this nature, arising under the conflict of laws of different countries, are often attended with difficulties, and it is not easy in all cases to say, what the rules are or ought to be, which are, under all circumstances, to govern in respect to the validity, the nature, the interpretation, and the obligations of contracts. In general, it may be said, that the validity, the nature, the interpretation, and the obligations of contracts are to be governed by the lex loci contractus, that is, by the law of the place, where the contract is made, if it is to be performed there; but if it is to be performed in another place, then it is to be governed by the law of the latter place. Story, Confl. Laws, §§ 242, 260, 263, 266, 270, 290. But this doctrine will carry us but a little way in the solution of many important questions. Other distinctions and other considerations must be resorted to, partly founded upon notions of public policy, partly upon private convenience or necessity in the general intercourse of nations, and partly upon local statutes, observances and usages.

Looking at the question presented in the case at bar, as to the liability of the owner for the acts of the master, the natural inquiry first occurring to the mind, would be, what is that authority which the owners have confided to him. Is it a general authority to bind them in all cases whatsoever? Or is it a limited authority to bind them only in certain cases, and to a certain extent? There is no reason to say, that a master of a ship has any more authority to bind the owners, than any other agent has to bind his principal. The authority is deducible solely from the nature of his employment, and the express or implied incidents to the trade or business in which the ship is engaged. If the ship is owned and navigated under the flag of a foreign country, the authority of the master to contract for, and to bind the owners, must be measured by the laws of that country, unless he is held out to persons in other countries, as possessing a more enlarged authority. He is but an agent, and no person dealing with him has a right to suppose that he is clothed

with any authority beyond what the laws of the country, to which the ship belongs, deduces from the nature of his employment. or which, by his instructions, express or implied, he is held out to the world to possess. If any person chooses to trust him under any other circumstances, or beyond this—it is a matter of blind credulity, and at his own peril. No one' ever imagined, that in any other case of agency to be transacted in a foreign country, the principal was bound beyond the instructions or authority given to his agent. It is every-day's experience to repudiate contracts and other transactions of agents in foreign countries, where they have exceeded the authority confided to them by their principals; and the authority confided by the principals is, in all such cases, measured by the interpretation and extent of that authority, by or according to the law of the place where it is given—by the lex loci, and not by the laws of a foreign country, of which the principal is, or may be wholly ignorant, and by whose regulations he is not bound. Any other rule would subject the principals to the most alarming responsibility, and be inconsistent with that just comity and public convenience, which lies at the foundation of international private law. No one ever imagined, that the master of an American ship ever possessed any power or authority over the voyages or concerns of that ship, or the interests of the owners, beyond what the law of his own country justified and sanctioned. No one ever imagined, that a master of an American ship could let his ship on freight, or enter into a charter party in a foreign country, unless that was the habitual employment of the ship, or was authorized by the instructions of the master. If we were to resort to a different rule—to the laws of the different countries which the ship might visit, for the interpretation of his powers, while he was in the ports of that country,—we should have the most extraordinary and conflicting obligations arising from the duties, and rights, and liabilities of the master, deducible from those laws, which, in many cases, limit those matters in a very different manner, and prescribe very different regulations.

If it should be said, that the laws of the country, where the master enters into a contract, are to govern as to the validity, obligation and effect thereof, that may be true as to himself. But how can the laws of a foreign country clothe him with an authority to bind his owners, which the latter have never given him. or which the laws of the country, to which the ship belongs, have denied him to possess? The owners cannot, in such cases, be bound by foreign laws, to which they have never assented, and under which they do not live. The general rule of international law on this subject, for the repose and convenience of the whole world is, "Statuta suis clauduntur territoriis, nec ultra territorium disperantur." The laws of a foreign country may regulate the rights of parties to property found in one country; but they cannot regulate rights of persons not subjected to their civil jurisdiction, or not residents within it. In the laws of England and America it is an established principle,—as old, almost, as the navigation of those countries,—that the authority of the master, as to the employment of the ship, or the repairing of the ship, or the supplying of the ship with provisions or other necessaries, abroad as well as at home, is limited by the express or implied authority derivable from the laws of the country, or the usage of the trade, or the business of the ship, or the instructions of the owner; and he cannot bind either the ship or owners beyond these limits. Mr. Abbott, in his treatise on Shipping (Am. Ed. 1829, pt. 2, pp. 90–132, c. 2, and chapter 3, per tot), lays down the principle in the broadest and most expressive terms, and illustrates it by references to adjudications, which constitute the laws of both countries. Nearly all those adjudications respect ships employed in foreign voyages, and the questions have generally been, whether, in the given case, there was an excess of authority on the part of the master, or not. No one ever heard of a discussion, in these cases, of whether the laws of a foreign country gave the master such an authority; but the sole point has been, whether the laws of his own country did. Their constant affirmation on one side, and their total silence on the other, as to the operation of foreign laws, in cases of such constant occurrence, are decisive to show the legal as well as the common understanding upon the subject. Upon money taken upon bottomry, or money advanced for expenses and supplies, and equipments, in foreign ports, we never inquire what would be the authority of the master in such cases, by the foreign law, in the port where the money is taken upon bottomry, or money is advanced; but whether, by our own laws, it was for necessaries, or within the scope of the master's authority according to the doctrines of our own law. The same test is applied to the case of a sale of the ship or cargo in a foreign port. It is held bad or good, according to the requirements of our law, and not of the foreign law. I do not go over the cases, either English or American, upon this subject. They will be found generally collected in the text of Mr. Abbott on Shipping, in the chapters already referred to, and in the notes to the American edition of 1829. The cases of The Gratitudine, 3 C. Rob. Adm. 240, and The Nelson, 1 Hagg. Adm. 169, 175, 176, before Lord Stowell; and the cases of The Aurora, 1 Wheat. [14 U. S.] 96, and The Virgin, 8 Pet. [33 U. S.] 538, before the supreme court of the United States,—are complete illustrations of the doctrine generally adopted, and seem of themselves, although there are many auxiliary authorities, to be decisive on the subject. I might. indeed, add the case of The Fortitude [Case No. 4,953], as in some measure expressive of

my own judicial opinion upon the general question, although that case did not call for any direct application of the foreign law. But the case of The Packet [Id. 10,654], did involve the very question of the Norwegian law, if it had been imagined by any one to be applicable. It is no answer to say, that the question was not made in any of these cases, because the general maritime law upon the subject was supposed to be the same in all commercial countries. The citations in the case of The Gratitudine, 3 C. Rob. Adm. 240, from foreign ordinances and jurists, sufficiently show, that great diversities do exist in foreign countries; and the arguments on the present occasion have brought some of them in review before the court. See, also, Story, Confl. Laws, § 286b; Appleton v. Crowninshield, 3 Mass. 443; Id., 8 Mass. 340. In the case of The Nelson, 1 Hagg. Adm. 169, 176, Lord Stowell, speaking upon the subject of bottomry bonds, said: "The form of these bonds is different in different countries; so is their authority. In some countries they bind the owner; in others not; and where they do not, though the form of the bond affects to bind the owner, that part is insignificant, and does not at all touch the efficacy of those parts which have an acknowledged operation." And he accordingly held, in that very case, which was of a bond executed at the Cape of Good Hope, that it did not bind the English owners personally, although in terms it purported so to do; but that it was inoperative, pro tanto.

If, indeed, there be any general rule deducible from the maritime law on the subject of the rights of the master, it is, that the master can bind the owners only so far as regards the employment and business of the ship. He has no general authority to bind the owners personally. The Roman law prescribed the general limits; and it constituted the basis of the laws of continental Europe. "Cum magistris propter navigandi necessitatem contrahamus, æquum fuit eum qui magistrum navi imposuit, tenerii ut tenetur qui institorem tabernæ vel negotio præposuit." Dig. lib. 14, tit. 1, c. 1, Intro. And again: "Omnia enim facta magistri debet præstare. qui eum præposuit; alioquin contrahentes decipientur." Dig. lib. 14, tit. 1, c. 1, § 5. But then it is added: "Non omni ex causa prætor dat in exercitorem actionem sed ejus rei nomine, cujus ibi præpositus fuerit; id est si in eam rem præpositus sit." Dig. lib. 14, tit. 1, c. 1, § 7. And the rule on the subject, generally proclaimed on the continent of Europe by the jurists and the ordinances of the different maritime nations generally, has been, that the master cannot bind the owners personally, at all; but only to the extent of their interest in the ship and freight. The Consolato del Mare, one of the earliest and most venerable monuments of the maritime law, and of the general customs and usages of the sea, asserts, in the most distinct terms, that the master has no power to bind either the person or the property of the owners, unless they have given him a sufficient power for that purpose. Consolato del Mare, c. 33, as cited by Emerigon, tom. 1, c. 4, § 11; Casaregis, tom. 3; Il Consolato del Mare (Ed. 1740) p. 115, c .33. And Emerigon cites many of the more modern jurists and ordinances to the same effect, that the master has no power to bind the owners personally, without an express authority, but the ship and freight only, even in cases of necessity. Emerig. Des. Assur. tom. 2, c. 4, §§ 7, 8, 11. See, also, Valin, Comm. 2, tom. 1, lib. 2, tit. 8, art. 2, and ordinances there referred to. The same rule is prescribed and recognized by the ordinance of the marine of France. Valin, Comm. tom. 1, lib. 2, p. 568, tit. 8, art. 2. Indeed, it may well be doubted, if any where, except in England and America, the rule has, for a great length of time, prevailed, that the liability of the owners, for the acts of the master, shall extend beyond the value of the ship and freight committed to his charge. But what I wish to rely on is the fact, that the master has no power to bind the owners, beyond the authority given to him by the owners; and that, from the nature of the case, the extent of that authority must be limited to the express instructions of the owners, or the law of the country where the ship belongs and they reside; for it is there that the authority is given, and there it is to be interpreted. If, by the law of the domicil of the ship and of the owners, the authority of the master is limited to the ship and freight, and does not, in the absence of express instructions, bind the owners personally, it seems difficult to understand how resort can be had to the law of a foreign country, unknown and unsuspected (it may be), by the owners, to expand that authority to the positive creation of personal obligation on the part of the owners; and that, too, according to the law of every successive country which the ship may visit in the course of a circuitous voyage. See Story, Confl. Laws, § 286b.

I am fully aware of the bearing of the cases of Malpica v. McKown, 1 La. 248, 254, and of Arayo v. Currel, Id. 528, in the state of Louisiana. With the greatest respect for the learning and ability of the judges who decided those cases, they appear to me to proceed upon false principles, and to be at war with the current doctrines of the common law. The decisions, in both of these cases, proceeded upon the ground, that there is no difference in the legal result, whether a contract is made in a foreign country by an agent, or it is made by the principal himself, personally, in that country. In each case it is to be treated as a contract made in that country, and possessing all the obligations of the like contracts in that country; personal, if personal, or real, if real: or both, if the lex loci contractus should so ordain. Assuming the general rule to be so, to what cases does it properly apply? Certainly to

those, and those only, where the agent possesses full authority to make the particular contract. If his authority is restricted or limited, then, if he exceeds the powers conferred to him, there is no binding obligation whatsoever upon the principal, and the contract is, as to him, a nullity. If the principal had himself been in the country, he might, if he chose, have made a more expanded contract, than his agent was authorized to make; or he might have made such a contract as his agent was authorized to make, with all its restrictions, and none other. This would depend solely upon his own pleasure. But when he has restricted the authority of his agent, in terms, to certain limits, or those limits result from the law of his own country, where the authority is given, and is to be interpreted, surely it cannot be pretended, that the contract of the agent in a foreign country, exceeding those limits, has the consent or authority of the principal. It appears to me that the leading error, in both of those decisions, (and I speak with the greatest respect and deference for these learned judges) is, that in both those cases, the rights and powers of the master to contract were treated exactly as if they were equal to, and coincident with, those of the owners, if the latter had been upon the spot. Whereas, the rights and powers of the master, so far from being coextensive with, and equal to, those of the owners, are, in most cases, far short of theirs, and are subject, at all times, to the control and restrictions which the owners personally, or the law of their country, impose or recognize. Emerigon has been supposed, by the learned judges, to have taken the same view of the matter which they have. But to me his opinion appears far otherwise. In the first place, he clearly admits, that the master has no authority to take up money on bottomry, except in cases of necessity; and then assuming, that the local law of the domicil of the owners of the ship clothes him with authority, in such a case, to take up money on bottomry, he discusses the question, whether, if the master were prohibited from so borrowing, by the instructions of the owners, unknown to the lender, the bottomry would be void; and he holds, that it would not; which is precisely the result to which our own law arrives. The ground obviously is, that private instructions, unknown to the lender, cannot affect his rights, when he knows that the general maritime law of the country, to which the ship belongs, imports that the master possesses the right to hypothecate, as a part of the common authority delegated to him. Indeed, throughout the whole of this section of his work, Emerigon relies upon the Roman law as the first foundation of the doctrine; and he cites it with approbation, and manifestly considers its application to the case which he was considering as controlled by the circumstances. What says the Roman law on the point? Every person, contracting with an agent, is bound to know the condition of the person with whom he contracts. If he is the master of a ship, that he has a right to trust him only with reference to that ship; and that the very appointment of the master imposes a certain law upon the contracting parties; so that if the authority is exceeded, the owner is not bound. "Qui cum alio contrahit vel est, vel debet. esse. non ignarus conditionis ejus." Dig. lib. 50, tit. 17, l. 19. "Ut sciat. in hoc se credere, cui rei magister quis sit præpositus." Dig. lib. 14, tit. 1, l. 7, Intro. "Præpositio certam legem dat contrahentibus, modum egressus non obligabit exercitorem." Dig. lib. 14, tit. 1, l. 1, § 12. Now, this is the very mode in which (as I understand) our law contemplates the same subject. If the party contracts with the master of a ship, he is bound to inquire what authority he has from the owners of the ship to make the particular contract, and whether he can bind them personally, or only bind the ship and freight thereby. The question is, not what authority the law of the country where the party making the contract with the master gives, but with what authority the master is clothed by the laws of the domicil of the owners. See Story, Confl. Laws, § 286b, and note, and Mr. Brodie's note to 2 Stair, Inst. pp. 955, 956.

Upon the whole, my opinion on this point is, that the master can make no contract in a foreign country, which shall bind the owners of the ship, except as to what they expressly authorize, or the general law of their own country has recognized and established; and then it will bind them no farther than that law binds them, whether it be in personam or in rem. Thus much I have thought it necessary and proper to say upon the point; although, if the law of Spain and that of Massachusetts be coincident, it might seem, at first view, not to be an important inquiry. But it has nevertheless, become indispensable, inasmuch as the plaintiffs contend, that the contracts of shipment, in the present case, are to be construed according to the law of Pennsylvania, as the goods were to be there delivered, and not by the law of Spain, or of Massachusetts, supposing the latter to impart a limited responsibility, on the part of the owners, for the contracts, as well as for the acts, torts and misconduct of the master during the voyage. I shall have occasion hereafter to consider the question, what is the true nature and interpretation of the statute of Massachusetts, and whether that statute recognizes or permits any distinction between the lawful contracts made by the master, in the course of his employment, authority and duty, in the course of the voyage, and his acts or torts or misconduct done in the course of the voyage, contrary to his authority and duty. and without the assent of the owners. At present, it is only necessary here to state, that the extent of the responsibility of the owners of

the schooner for and upon such contracts, or acts, torts or misconduct of the master, is to be measured altogether by the law of Massachusetts, and not by the law of Spain or of Pennsylvania. But when it is said (and it is most properly so said) that the law of a place where the contract is to be performed is to govern, and not the place where the contract is entered into, we are to understand this rule of international law with all its proper qualifications and limitations. In the first place, the rule cannot prevail, or be obligatory, where the very contract, in the form in which it is made, although to be performed or executed in a foreign country, is pronounced invalid or void by the law of the country where it is made. Thus, for example, a contract entered into in Massachusetts, for a voyage to Africa, and from thence to a foreign market, for the purpose of carrying on the African slave trade—prohibited by our laws—would be illegal and void here, even if it were lawful and valid in Africa. In the next place, if a contract is to be performed, partly in one country and partly in another country, it admits of a double aspect, nay, it has a double operation, and is, as to the particular parts, to be interpreted distinctively; that is, according to the laws of the country where the particular parts are to be performed or executed. This would be clearly seen in the case of a bill of lading of goods, deliverable in portions or parts at ports in different countries. Indeed, in cases of contracts of affreightment and shipment, it must often happen, that the contract looks to different portions of it to be performed in different countries; some portions at the home port, some at the foreign port, and some at the return port. In respect to the bills of lading in the present case, if the language admitted of two interpretations, that would certainly be adopted which comported most exactly with the apparent intention of the parties. For example, in this very case, we have some of the bills of lading in the Spanish form and language, and some in the American form and language. Which is to prevail, if the meaning of the words in both languages are not absolutely identical? Doubtless, that which will best effectuate the apparent intention of the parties, deducible from the objects of the contract. The goods here were deliverable in Philadelphia; and what would be an effectual delivery thereof, in the sense of the law, (which is sometimes a nice question) would, beyond question, be settled by the law of Pennsylvania. But to what extent the owners of the schooner are liable to the shippers for a nonfulfilment of the contract of shipment of the master,—whether they incur an absolute or a limited liability, must depend upon the nature and extent of the authority which the owners gave him, and this is to be measured by the law of Massachusetts.

Passing from this subject, let us next proceed to the consideration of the next point arising in judgment; did the bottomry bond in the present case cover the cargo, or only the ship and freight? In the obligatory part, the "hull and appurtenances" of the schooner only, are bound. But in the recital of the condition, it is expressly stated, that the money is to be taken upon "the adventure of the said schooner or vessel, and the cargo on board," &c.; and it is afterwards declared, "And, therefore, the said Isaiah Atkins (the master), doth mortgage, and hypothecate to the said Augustus John Foyard, and Samuel Satton Smith, and each or either of them, their and each or either of their executors, administrators, or assigns, the said schooner or vessel called 'the Annawan,' with all the boats, tackle, apparel, and furniture, and also the cargo, merchandise, and effects, laden on board thereof for the said voyage." Now, there can be no real doubt, upon these allegations, that it was the intention of the parties, that the cargo, as well as the schooner, should be submitted to the bottomry bond, and hypothecated accordingly. A court of admiralty, in cases within its civil jurisdiction, acts as a court of equity, and construes instruments, as a court of equity does, with a large and liberal indulgence. Bottomry bonds, are very informal instruments, inaccurately drawn, and in their forms varying, not only in different countries, but in the same country; and, therefore, are constantly construed with a wise reference to the laxity of the habits of merchants, and to the imperfections, which are usually found in commercial instruments. I have no doubt, whatsoever, that the present bottomry bond does contain a positive pledge of the cargo, as well as of the ship; and if it did not, and the omission was by mistake or fraud, I have as little doubt, of the competency and duties of a court of admiralty to reform it, and to enforce it according to the intention of the parties. Such was the doctrine of this court, in the case of The Zephyr [Case No. 18,210], and I feel not the slightest inclination now, to doubt it, or to depart from it. See, also, Emerig. Contrats a la Grosse, tom. 2, c. 5, § 1, note 3.

The next question is, whether in the events detailed in the statement of facts, and the evidence, the money on the bottomry bond became due, and payable to the lender? I am of opinion, that it did become due. The voyage was not completed from any incapacity of the schooner to perform it; and in point of fact, she did, after being repaired, return safely to the United States. The voyage was broken up by the master voluntarily, upon the ground, that the schooner was not worth repairing for the voyage, because the expense of the repairs would exceed her reasonable value, or what ought, with reference to the interests of the owners, to be expended upon her, to enable her to carry the cargo to the port of destination. I do not say, that the master acted unwisely or improperly, un-

der all the circumstances, in coming to this conclusion. Perhaps, it was exactly what the owners might have done, if they had been personally present. But upon this, I give no opinion. If the owners had so abandoned the voyage, being personally present, because their interest would have been injuriously affected by not so doing; what ground could there be to say, that the bottomry bond should not be paid? We all know, that in the case of a deviation from the voyage, or a voluntary abandonment of it, after it has been commenced, the bottomry bond would have become absolute. In short, the rule in all cases of this sort, is precisely that of common sense, and is deducible from the Roman law, that the bondholder shall not have his money, if the nonperformance of the voyage has not been occasioned by the enumerated perils, but has arisen from the fault or misconduct of the master, or owner. "Quia suspicit in se periculum navigationis, suscepit periculum fortunæ non culpæ." [2] In the present case, it was a duty which the owners owed to the bottomry holders, if the schooner could have been repaired, so as to perform the voyage, to have made the repairs. It is no answer to say, that it was not for their interest. The voyage was not lost from the utter innavigability of the schooner, as if she had been shipwrecked, or stranded, and could not be gotten off. The bottomry holders undertake the risk of the voyage, and that the schooner shall be able to perform it, notwithstanding the enumerated perils, which in the present case were fire, enemies, pirates, and other dangers, and casualties, of the seas and rivers. But they do not undertake, that the vessel shall be able to perform the voyage without any repairs, or without any retardations; but only that the dangers and casualties of the seas and rivers, and the other perils, shall not of themselves defeat the voyage. They are to be paid their money, unless the voyage is defeated by such dangers, and casualties, or other perils, and by these alone. The case is not like that of an insurance, where the underwriters are liable for a partial loss, and for total loss, either in fact, or in a technical sense. In cases of bottomry, there can be no such thing as an abandonment, by which a loss, not strictly total, can be turned into a technical total loss. It is true, that if the owners do not choose to repair the vessel, after she has met with disasters in the course of the voyage, when it may be done, they are at liberty to abandon her to her fate. But then the bottomry holder is entitled to his full lien upon the ship, and cargo, and, as far as they are saved, when the voyage is thus abandoned, he may proceed to enforce his lien pro tanto

against them; for the case, in which he is to lose his money, has not occurred, that is, a total loss of the ship and the voyage, by the dangers, and casualties of the seas and rivers, and the other enumerated perils. The language of the present bond is still more expressive, than what is usually found in such instruments. It declares, "or if in the said voyage, an utter loss of the said schooner or vessel by fire, enemies, pirates, or other casualty, shall unavoidably happen, &c. &c., then the above written obligation shall be null and void, or else shall be and remain in full force and virtue." Now, can it be truly said in this case, that there was an utter loss of the schooner, an utter incapacity to perform her voyage, by reason of any of the enumerated perils. In Joyce v. Williamson (reported in Park, Ins., 7th Ed., p. 627, c. 21; 2 Marsh. Ins., 2d Ed., bk. 2, p. 754, c. 5, and since reported in 3 Doug. 164), which was an action of a bottomry bond, where a ship had been captured, and restored on payment of salvage, and was afterwards repaired, and performed her voyage, and carried freight, but the ship and freight were not then worth the sum mentioned in the bottomry bond, and the amount of the repairs; the court held the bondholder entitled to recover, upon the ground that the voyage had been performed. Lord Mansfield, in delivering the opinion of the court, said; that by the law of England, upon a bottomry bond, there is neither average, nor salvage; that although there had been a capture, yet to bring the case within the condition of the bottomry bond, it must not be a mere temporary taking, but be such a taking as constitutes the loss of the ship, and which would amount between the insurer and insured to a total loss. Now, by this language, his lordship must be understood to mean, not a technical total loss, entitling the insured to abandon; (for there can be no abandonment, technically so called, on a bottomry bond; and if there were, then the bottomry holder would, in fact, be liable for an average loss); but he meant a total loss in the sense, that the ship is reduced to a state of total incapacity to perform the voyage, and cannot be repaired, so as to perform it; or, in other words,—to use the phrase of foreign jurists,—that the ship is in a state of utter innavigability; such as arises from shipwreck, or stranding, when the ship cannot be gotten off, or repaired at all. We shall presently see, that if the ship can be gotten off, or repaired, no matter at what expense the repairs must be, the rights of the bondholder are not affected thereby. But what is most material to be considered, in the case of Joyce v. Williamson, is, that neither the repairs nor the salvage were taken into account in the suit on the bond; but the bondholder moved the full amount without any deduction whatsoever.

The doctrine already suggested, that in cases of bottomry, nothing but an actual total loss of the ship in the voyage will ex-

---

[2] Mr. Marshall (2d Ed., bk. 2, p. 756, c. 5) cites this as a passage from the title of the Digest (liber 22, tit. 2) "De Nautico Fœnore." But I have not been able to find it there. See Roccus. De Nav. note 51.

cuse the borrower from payment, not even when, by reason of the enumerated perils, the ship shall require repairs greater than her value, is fully borne out by authority. The case of Thomson v. Royal Exch. Assur. Co., 1 Maule & S. 30, is directly in point. That was an insurance upon a bottomry bond; and the ship during her voyage, by tempestuous weather, suffered so much damage as to become totally disabled, and put into an intermediate port to repair; and upon a survey it was found, that the necessary repairs would cost $3,200, and after their completion, the ship would be worth only $2,000. The owners, therefore, caused her to be broken up and sold. Her original value, when she sailed on the voyage, was $4,000. The court held, that there could be no recovery on the policy. Lord Ellenborough, in delivering the opinion of the court, said: "This was not a question, whether such a loss had happened as, in the case of an insurance on the ship, might have entitled the assured to abandon; but whether it was an utter loss within the true intent and meaning of the bottomry bond. The distinction between an insurance upon the one and the other is simple; in the former case, if the voyage be lost, or not worth pursuing, or the ship be reduced to such a state that she cannot proceed without refitting, the expense of which would greatly exceed her value, the assured may abandon and claim as for a total loss; but in the latter case, as nothing short of an actual total loss will discharge the borrower of money upon bottomry, so nothing less will render the insurer liable. Here the thing continued to exist as a ship, her hull and bottom remained, though perhaps in such a state as might make it prudent for the owners to dispose of her. I have had occasion at The Cockpit to state this distinction as established law; that in the case of bottomry nothing short of the total destruction of the ship will constitute an utter loss; if it exists in specie, in the hands of the owner, it will prevent an utter loss." For these reasons, I am of opinion (as I have already stated,) that the bottomry bond did become due, and payable to the holder, upon the breaking up of the voyage, and selling the schooner at Bermuda.

And this conducts us to other very important questions in the case. In the first place to the consideration of the acts of the master, during the course of the voyage, how far they were justifiable and proper under the circumstances, for to that extent, neither he nor the owners can be involved in any responsibility; and how far they were unjustifiable and improper, and might and did involve the owners of the schooner in responsibility therefor. And in the next place, supposing the owners to be involved in any responsibility, to what extent, and under what circumstances, it applies. In respect to the sale of the perishable and damaged fruit at Bermuda, upon the first arrival there, the proceeds of which amounted to $1,029.70, there does not seem any doubt, that it was a justifiable and proper sale. The principal question arising is, whether he had a right to appropriate those proceeds towards the repairs of the ship, and, if he had, then what rights the shippers have over against the owners of the schooner, for compensation and indemnity therefor. In the first place, as to the right of the master to appropriate the proceeds towards the repairs of the ship. It seems to me, that he clearly possessed such a right; for, independently of the sale being of perishable articles, I take it to be clear, that the master has a right to sell a part of the cargo to make repairs, and to furnish necessaries for the completion of the voyage. This was expressly held by Lord Stowell in the case of The Gratitudine, 3 C. Rob. Adm. 240, 259, 263, 264, and the same doctrine was affirmed by this court, in the case of The Packett [Case No. 10,654]. Emerigon, and Valin, and Pothier, affirm the like doctrine; and indeed, it has the sanction of the Consolato del Mare (chapter 105), and of most of the maritime writers, and foreign ordinances. See Emerig. Des Contrats a la Grosse, p. 445, c. 4, § 9, etc.; Stypmannus, Ps. 4, p. 417, c. 5, note 109; Kuricke, 765. But then, in the next place, what is the extent of the liability of the owners, for the property so appropriated? Now, if there were no statute limitation, affecting the present case, but the owners stood before the court upon the general liability created by the Roman, and the English, and the American law, it is plain, that the appropriation being for the use of the ship, and within the scope of the master's authority, the owners would be liable to pay the shippers the full amount of the proceeds so appropriated. Abb. Shipp. (Ed. 1829) pt. 3, c. 5, §§ 1–7. What effect, then, has the statute of Massachusetts? In my judgment, if it applies at all to a case like the present (a point which will come under our consideration hereafter), it has this, and no more, that the liability was before coextensive with the amount appropriated; but it now has the limitation interposed, that it shall not exceed the interest of the owners in the ship and freight; that is to say, they are liable to pay the full sum so appropriated, when it does not exceed the value of the ship and freight; and if it does exceed that value, they are exonerated from all liability, beyond the value of the ship and freight. See The Dundee, 1 Hagg. Adm. 109; Gale v. Laurie, 5 Barn. & C. 156; Morris v. Robinson, 3 Barn. & C. 196. The claim of the shippers is not reduced to a mere lien in rem, although I am satisfied, that the shippers possess such a lien. But it is a personal claim upon the owners pro tanto, with the auxiliary security of the lien on the ship and freight. Precisely the same view is taken of this point by foreign jurists, and es-

pecially by Valin, and Pothier, and Emerigon. Emerig. Des Contrats a la Grosse, p. 445, c. 4, § 9; Valin, Comm. tom. 1, liv. 2, pp. 568, 569, tit. 8, art. 2; Poth. Mar. Cont. notes 34, 72. When does this personal liability and this lien attach to the owners, and to the thing? My answer is, it attaches eo instanti, when the appropriation is made; and consequently, from that moment the obligation becomes positive and unequivocal.

Then arises, in the next place, the farther consideration, whether the liability of the owners in personam is absolute, or is affected with the future fate of the ship on the voyage? Upon this point, the foreign ordinances promulgate different doctrines, and the foreign jurists hold different opinions. See Boulay Paty, Droit Comm. tom. 1, tit. 3 pp. 268–299; Emerig. Traite a la Grosse, c. 4, § 11. The Consolato del Mare (chapter 105) gives the shippers in such a case a lien and privilege only on the ship. The Laws of Oleron (article 25) and the ordinance of Antwerp (article 19) seem to make the payment dependent upon the ultimate arrival of the ship at her port of destination. Emerig. Des Contrats a la Grosse, pp. 446, 447, c. 4, § 9. Emerigon seems to follow the same opinion, and says: "It is then evident, that if the ship perishes, neither the master, nor the owners are subject, on that account, to any personal obligation. It is here a sort of forced loan upon bottomry." Valin is of the opposite opinion, and holds that the owner of the ship ought to pay the value of the goods sold during the voyage, for the necessaries of the ship, without any regard to the future fate of the ship, whether she perishes during the voyage or not. in the same manner, as if, instead of selling the merchandise of the shipper, he had borrowed the money of another person. And he insists, that the interest of the public requires such a decision. Pothier, while he admits, that persons of experience, whom he had consulted, were of opinion, that the owners of the merchandise sold to supply the necessities of a ship could demand nothing, if the ship should afterwards be lost, pointedly holds a different opinion, and insists, with Valin. that in such a case the owners of the ship are personally responsible for the merchandise sold. He deems it to be a sort of forced loan for the necessaries of the ship, which the master has personally contracted to repay to the owner of the merchandise. And he insists, that the master is entitled to have recourse to the owner of the ship, for his own indemnity therefor; and that the owner of the merchandise, as exercising the rights of the master, has a remedy over against the owner of the ship, whether the ship afterwards perishes or not. The ordinance of Wisbuy (title 2, art. 2) adopts the same rule; and it seems approved by Kuricke. and by Cleirac. Emerig. Traite a la Grosse. c. 4, § 9; Kuricke, Jus. Mar. Hanseati, tit. 6, art. 21; Cleirac, Ordin. d'Oler-

on, p. 88, art. 22, note 2. It seems to me, upon principle, with reference to our law, that the opinions of Valin and Pothier are entitled to very great weight. As has been already suggested, the limitations of the responsibility of the owners of the ship are mere qualifications of the antecedent rule of our law, and do not change the nature of the rule. The owners are, and ought to be held personally bound to pay all the lawful contracts of the master, to the full amount thereof, not exceeding their interest in the ship and freight. And where there are various claims, which have occurred at different times, the just principle would seem to be found in the maxim, "Qui prior est in tempore potior est in jure." In other words, the earliest creditor has a priority or privilege over the others for his prior debt.

Hitherto, the question under consideration has been examined upon the assumption, that the statute regulations of Massachusetts were equally applicable to all cases of contracts made by the master, within the scope of his authority, confided to him by the owners, as well as to all cases where he has exceeded his authority, or is guilty of any tort or misconduct in the course of the voyage. But it may admit of most serious doubt, whether the statute of Massachusetts was designed to apply to any cases of contracts, strictly within the scope of the authority of the master, and in respect to which, he not only had a right to bind the owners, but his acts were justifiable and proper. and indeed throughout a part of his duty, under the circumstances. The language of the statute is, that "no ship-owner shall be answerable beyond the amount of his interest in the ship and freight, for any embezzlement, loss, or detention by the master, or mariners, of any goods, wares, or merchandise, or any property put on board of such ship or vessel, nor for any act, matter, or thing, damage, or forfeiture, done, occasioned, or incurred by the said master or mariners, without the privity or knowledge of such owner." Now, there is not one word in this clause about the contracts of the master lawfully made by him, on account of the owner during the voyage, or any acts done strictly within the line of duty to the owners. The whole language seems exclusively applicable to cases of wrongs, to "embezzlement, loss or destruction," of property, and to "any act, matter, or thing, damage, or forfeiture, done, occasioned, or incurred by the master or mariners," during the voyage; and if we construe the words as meaning to import acts, and matters, and things, ejusdem generis, (which, in such cases, is a general rule of interpretation), there is nothing to lead to the conclusion that the statute, in its policy or objects, had any reference to contracts made by the master in the course of his duty, and for the benefit of the ship, and with the implied consent or authority of the owner: for

the words are added, "without the privity or knowledge of such owner." And there is good reason for the distinction. The owners might otherwise be ruined by the wrongful acts of the master or mariners. But the lawful contracts of the master, within the scope of his duty, are just such as the owners have authorized, and are and can be deemed, in no just sense, wrongful, but are such as fairly are by implication "with the privity and knowledge of the owners." Besides, the statute uses the language, "master or mariners," which plainly evinces, that it was intended to be applied to acts, matters, and things, which might be indifferently done by either of them. Now, the mariners, as such, have no authority whatsoever to enter into contracts in behalf of the owners. There is no case in the Massachusetts Reports, which hints at any applicability of the statute, to any cases of contracts lawfully made by the master, or to any acts done in relation thereto, which are strictly authorized by the owners. I have looked into the English statutes upon the same subject, (from which the Massachusetts statute was apparently borrowed), and I find, that they are solely applicable to cases of torts and malfeasance of the master and mariners. The only decisions, which I have been able to trace in the English books of Reports upon the subject, are cases of tort, and misconduct. Such was the case of The Dundee, 1 Hagg. Adm. 109; Gale v. Laurie, 5 Barn. & C. 156, which was a case of collision by the fault of the master and mariners; and the case of Wilson v. Dickson, 2 Barn. & Ald. 2, which was a case of tort. See, also, Morris v. Robinson, 3 Barn. & C. 196.

Now, in cases like the present, where the ship is in want of repairs or necessaries, no one can doubt, that the borrowing of money or the procurement of supplies for the purposes of the voyage, are strictly contracts authorized by the owner and for his benefit. It is in such cases the duty of the master to borrow the money and procure the supplies; and his acts in so doing are not only reasonable and justifiable, but they are implicitly sanctioned by the owners. See The Aurora, 1 Wheat. [14 U. S.] 96, 102. If the loan is a simple loan—not on bottomry—or the supplies are made upon the general credit of the master or owner, and not solely on the credit of the ship, what ground is there to suggest, that the creditor is to take upon himself the subsequent hazards of the voyage, for which he receives no premium, and to which he has given no consent? If such were understood to be the general law applicable to the subject, so far from promoting public or private credit, it would, in all probability, lead to the necessity, in all such cases, of procuring money and supplies upon bottomry, at an onerous premium—a result which the statute could certainly not have intended. In truth, there would be difficulty in saying, under such circum-

stances, that the master could borrow money at all to supply the necessities of the ship; for by the general maritime law (which is the law of England and America), on this very point, the master has no authority to take up money on bottomry, if he can procure it upon the personal credit of the owner; and he cannot pledge the personal credit of the owner, according to the argument, because he can only bind the owner to the extent of the value of the ship and freight, if the voyage is successfully performed; and if she perishes in the voyage, then the lender loses his money without receiving or having a title to receive any maritime interest for the risk. Under such circumstances, what person of ordinary prudence would lend any money to the master to supply the necessities of the ship? It would be downright folly. The consequence of a doctrine, which should thus restrict the right of the master to borrow money for the necessities of the ship, would in many cases be, that the ship would perish for the want of repairs or the voyage be abandoned. A construction of the statute which should lead to such consequences ought not to be adopted, unless it be inevitable, which certainly cannot be affirmed of the statute under consideration.

There is this additional consideration, which deserves notice. It is, that the remedy by the statute of Massachusetts is not a remedy in rem for the loss sustained or the liability incurred. But the remedy is strictly in personam, and the amount which is recoverable is not to exceed the value of the ship and freight. But at what time is this value to be ascertained and fixed? It must be the value at the time when the right of action against the owners first accrues, and not at any subsequent period. Suppose after the right of action has attached, the ship perishes, that will not affect the right of recovery of the shipper in a case of tort; and a fortiori it will not in a case of contract, made by the master, by and under the authority of the owners. This doctrine is fully sustained by the case of Dobree v. Schroder, 6 Sim. 291, 2 Mylne & C. 489, and Wilson v. Dickson, 2 Barn. & Ald. 2. So that, in this limited view of the matter, the owners would be personally liable for the money advanced, since at the time when it was advanced it did not exceed the value of the ship and freight. I am the more confirmed in this opinion by the article of the marine ordinance of France of 1681, which declares "that the owners of ships shall be responsible for the acts of the master; but they shall be discharged upon abandonment of their ship and the freight." Ord. De la Mar. 1681, liv. 2, tit. 8, art. 2; Valin, Comm. tom. 1, p. 568. Now, in the interpretation of this provision, Valin expressly holds, that it does not apply to the case of money borrowed by the master on the course of the voyage for the necessary repairs and supplies of the ship, unless borrowed on bottomry; and that,

therefore, it is immaterial to the lender whether the ship afterwards perishes or not in the subsequent part of the voyage. Pothier adopts and firmly maintains the same interpretation. I am of opinion (says he), that the owners of the ship cannot avail themselves of the defence in the second article of the title "Des Proprietaires" (Valin, Comm. tom. 1, liv. 2, p. 568, tit. 8, art. 2) which makes them responsible for the acts of the master; but discharges them upon their abandonment of ship and freight, because this provision has no application but to such obligations (contracts) of the master, for which he could not have any recourse against the owners of the ship, to be indemnified by them." I am aware that Emerigon holds the opposite opinion; but I profess myself not satisfied with his reasoning. Emerig. Traite a la Grosse, pp. 453–465, c. 4, § 11. The opinion of Pothier and Valin stand fully confirmed by the modern code of commerce of France which contains a provision similar to that of the ordinance of Louis XIV. of 1681, as to the responsibility of the owners of the ship for the acts of the master, and exempting them from responsibility upon their abandonment of the ship and freight. Code de Comm. art. 214. But the same code makes the master personally liable (article 298) to the shippers for their goods sold by him for the ship's necessities, even if the ship afterwards perishes in the voyage. And Pardessus, in commenting on the code, puts it as clear, that in the case of such a contract, or indeed, of any contract by the master for supplies and repairs for the ship's necessities, without bottomry, the owners are bound to pay for the same ex contractu, notwithstanding the subsequent loss of the ship, because they are bound to indemnify the master in such a case, as he has acted within the scope of his authority. This, it will be at once perceived, is in exact coincidence with the opinion of Pothier and Valin. And Pardessus goes on to distinguish the case of such a contract made by the master, from the case of an act of tort or misconduct of the master; holding that the owners are not bound therefor, if they abandon the ship and freight. Pardessus, Droit Comm. tom. 3, arts. 663, 644, 717. On the other hand, Boulay Paty maintains the opposite opinion, reasoning it out at large, and arrives at the same conclusion as Emerigon. Locre, Esprit de Code de Comm. tom. 2, art. 298, and Comm. pp. 200–203. The council of state and the framers of the code seem, however, to have adopted the opinions of Valin and Pothier. Boulay Paty, Droit. Comm. tom. 1. tit. 3, pp. 293–299.

Now, although the present case is not, strictly speaking, the case of a positive contract made by the master for borrowing the money applied to the repairs, yet it is clearly the case of a quasi contract on behalf of the owners, or what Emerigon and Pothier call a "forced loan." It is a loan, which the

maritime law allows the master to make on account of the owners—as resulting from their implied authority, and with their consent. So it was treated in the case of The Gratitudine, 3 C. Rob. Adm. 240, 261, and in the case of The Packet [supra]. Then, it being a careful application of the funds of the shipper, with his consent, for the use and benefit of the owners of the ship, and by their authority and consent, it seems to me, that the case is governed by exactly the same principles as if the money had been borrowed of a third person, and applied to the same purposes; that is, it would have bound the master personally, and the owners personally, and have also created a lien on the ship in rem. From what has been just said, it follows, that the master and the owners, in the present case, are personally responsible for the funds of the shipper, applied towards the repairs of the ship. The shippers are also entitled to a lien therefor on the ship itself. Whether the bottomry bond, being afterwards given, would have been subjected to the priority of this lien on the ship, seeing that the funds went to enhance the value of the ship, when repaired, in favor of the bottomry lenders, if the shippers had insisted on that lien—it is unnecessary to decide. although I incline to the opinion that it would have been so subjected. But we are now at law in a case calling only for the expression of an opinion, whether the owner is personally liable for those funds so applied. And my opinion is, that the owners are so liable in the present suit. Then, in the next place, as to the second sales made at Bermuda on the return of the schooner there. after the second disaster. The sale of the perishable cargo was properly made; and to that no objection can be taken. But the sale of the wines falls or may fall under a different consideration. I agree, that it is not the duty of the master, in all cases of this sort, not to sell, simply because the property is not perishable. That must depend upon circumstances. I agree also. that the master is not bound in all cases to tranship: but that duty again depends on circumstances. What Lord Stowell said in the case of The Gratitudine, 3 C. Rob. Adm. 240, 259, 261, on this point, is very important. "There are other cases" (said he) "also in port, in which the master has the same authority forced upon him. Suppose the case of a ship driven into port with a perishable cargo, where the master could hold no correspondence with the proprietor; suppose the vessel unable to proceed, or to stand in need of repairs to enable her to proceed upon her voyage. In such emergencies, the authority of agent is necessarily devolved upon him, unless it could be supposed to be the policy of the law, that the cargo should be left to perish without care. What must be done? He must in such case exercise his judgment, whether it would be better to tranship the cargo, if he has the means, or

to sell it. It is admitted in argument that he is not absolutely bound to tranship; he may not have the means of transhipment; but even if he has, he may act for the best, in deciding to sell; if he acts unwisely in that decision, still the foreign purchaser will be safe under his acts: If he had not the means of transhipping, he is under an obligation to sell, unless it can be said, that he is under an obligation to let it perish." And again; "it is admitted that though impowered to tranship, he is not bound to tranship. No such obligation exists according to any known rule of the maritime law: and if it did, still he must be affected with the opportunity of transhipment, and with wilful neglect of such opportunity, for wilful neglect shall not be presumed. He may even be restrained from shipment if he has the means, by knowing that insurances were made on the original shipment which might be avoided by such a change. Having the general duty of carrying the cargo to the place of destination imposed upon him, not being obliged to tranship, and it not being shown that he has the opportunity of transhipment, he must be presumed to look out for the means of repairing his ship for the accomplishment of his contract. The first and most obvious fund for raising the money, is the hypothecation of the ship; but the foreign lender has a right to elect his security, for he is not bound to lend at all; he may refuse to lend upon the security of the ship, or on that security alone; it is no injustice on his part; and if he does so refuse, the state of necessity still continues."

In respect to the sale of the fruit, which was then sound, and especially of the wine, so far as it is attempted to be justified as a fit exercise of discretion on the part of the master, I am of opinion that the justification totally fails. The port of Bermuda was near to the United States, and the means of communication with the consignees and the other parties interested, were easy, and capable of being accomplished in a brief space of time. Besides this; the letters from the consignees and insurers, sent to the consignee of the ship (who were the bottomry holders), which were necessarily brought to the notice of the master, were clearly expressive of a strong and earnest desire on their part, that the cargo not in a perishing condition, should be shipped to the United States and not sold at Bermuda. This admonition seems to have been totally lost sight of by the master, and also by the bond-holders. The latter seem to have been absorbed in the consideration of their own interests; and the master either exercised no judgment at all, or was ready to rely on any advice or recommendation, that he could obtain. Under such circumstances—when it was most obvious, that the ship and the cargo would both be sold at a great sacrifice, as in fact they were, I cannot but consider the master guilty of gross and culpable negligence in the latter sale. Indeed, I cannot but think

that there was, on the part of the bond-holders and the master, a willingness to make the most of the case for the benefit of the bond-holders. How did it happen that, after the sale, the schooner with some temporary repairs reached Boston, with a part of her original cargo on board, viz: some of the fruit and wines? If the case had been one in which the bottomry bond had been brought before me in this circuit for consideration and decision, I should have watched the whole proceedings, and sifted them with the most scrupulous jealousy, and not without some lurking suspicions, that the transactions were open to much observation and censure.

But the case does not rest upon the general ground, whether the sale by the master was, under all the circumstances, independently of the bottomry bond, an exercise of sound and reasonable discretion. He was in the port where the bottomry factors resided; and they assure us, that they would not have allowed the ship and cargo to have left Bermuda, without the bottomry bond being fully paid. This statement is highly probable. However exorbitant the marine premium was, (and it certainly seems to have been exorbitant), and however open to litigation the claim of the bottomry holders might be, the master was completely subjected to their power, and dependant upon their moderation. Suppose he had refused to pay the bond, the immediate result would have been, proceedings in the admiralty against the ship and cargo, and in all probability an expensive litigation, and an order for the sale of the ship and cargo pending the proceedings; and thus a forced sale—quite as injurious, and possibly much more so —than did take place under the direction and with the consent of the master. Under such circumstances, I think he was excused, if not strictly justified, in selling the schooner and so much of the cargo as was necessary to extinguish the bottomry bond and the incidental expenses. But as to the residue of the cargo, he was utterly without excuse or justification; and he ought to be held liable to the full extent of the sacrifices and losses sustained by the consignees. He had no right to sell the same, unless in a case of necessity, that is, of a moral necessity, to prevent a greater loss to the shippers. No such necessity is established by the evidence in the present case. There is much wholesome doctrine on this subject in the cases of Reid v. Darby, 10 East, 149, of Freeman v. East India Co., 5 Barn. & Ald. 619, and of Morris v. Robinson, 3 Barn. & C. 196, although, perhaps, in some of these cases, it was pushed to an inconvenient extent. See The Sarah Ann [Case No. 12,342]; Hunter v. Parker, 7 Mees. & W. 340, 342; Gordon v. Massachusetts Fire & Marine Ins. Co., 2 Pick. 249; Bryant v. Commonwealth Ins. Co., 6 Pick. 131. But the question is not as to the liability of the master, but as to the liability of the owners of the schooner, to the shippers, for the unjustifiable sale of the master. And here, it seems to me, that the stat-

ute of Massachusetts, limiting the responsibility of the owners, in cases of the misconduct and torts of the master, properly and directly applies. They are liable therefor to the extent of their interest in the schooner and freight, and no farther, at the time of the misconduct and tortious sale. But at that very time, the ship was under a bottomry bond greater than her value, and by the breaking up of the voyage, and the sale of the schooner, the bond (as has been already suggested), became absolutely due to the bond-holders. These were acts of the master, contemporary with the voluntary sale of the cargo, and indeed, they may all be treated as one and the same transaction—constituting parts of the res gestæ—and done, as it were, uno flatu et uno intuitu. So that, at the time, the owners had, in effect, no interest whatsoever in the schooner or freight, but the value of both had been exhausted. The right of the plaintiffs, then, to recover against the owner is thus sapped to its very foundation, and their only remaining remedy is against the master himself, by an action for the proceeds of the sales now in his hands, or for his tortious conversion of the property, or in such other form as the plaintiffs shall be advised. If the ship owners had received the proceeds of the wines, and other sound parts of the cargo, from the master, it might have been deemed either an adoption of his act, or, at least, it would have been a receipt thereof, for the use of the shippers. But the ship owners refused to receive the same from the master, as they had a right to do. and so they are not involved in his unjustifiable acts in the sale of the wines and other sound parts of the cargo. It may be said, that here the acts of the master were done under a contract of shipment, lawfully entered into by the master, and, therefore, it falls within the same predicament as a contract or appropriation of the money of the shippers for repairs of the ship. and the ship owners ought to be held equally liable for the breach of each contract. The distinction between the cases is, I admit, nice; but at the same time it appears to me to be a clear and determinate distinction, sufficient to justify a different conclusion in the one case from that in the other. The conduct of the master in the case of the borrowing of money, and appropriating the funds of the shippers for the repairs of the ship. was a justifiable act throughout. It was done in the line of his duty, and with the implied consent and authority of the owners of the ship. The breach is on their part, in not repaying to the shippers the money so appropriated. In the case of the sale of the sound fruit and the wine, the master acted without the consent or authority of the ship owners, and in violation of his duty; and if they are to be made liable to the shipper, the liability is for his breach of duty, and not for their own breach of duty. The difference lies in this. that they are properly and personally liable for their own wrongful acts in violation of their own contract, to the full amount of the loss to the shippers; but that they are not liable for the wrongful acts of the master in violation of his duty to them and to the shippers, beyond the value of the schooner and her freight.

Then. in the next place, as to the claim for general average. So far as respects the putting into Bermuda for repairs and refitment the first time,—according to our law, the claim of the ship owners for a general average against the shippers of the cargo seems well founded. See 2 Phil. Ins. pp. 114–122, c. 15, § 4. In respect to the return to Bermuda, similar considerations may apply, although the voyage was never resumed, so far as respects the expenses of the return, until the voyage was broken up. But it does not strike me, that any allowance whatsoever for general average can, under the peculiar circumstances, be claimed by the ship owners as a deduction from the amount of the proceeds applied to the ship's use, for which they are liable to the plaintiffs. The reason is, that so far as such an allowance would go, it would amount to so much salvage of the value of the ship, and that it ought, therefore, to be primarily marshalled and applied, as it was in the case of The Packet [supra], in exoneration of the cargo affected by the bottomry bond. So that it is to be deemed as so much to be paid by the ship owners in remuneration of the claim of the bond-holders upon the cargo, and in the nature of a recouper or set-off against the claim of general average.

Upon the whole, my opinion is, that the defendants in the present case are responsible to the plaintiffs for the amount of their money appropriated and applied by the master at Bermuda for the repairs of the ship, before the bottomry bond was given; but not for the wrongful acts of the master subsequently done in the sale of the sound fruit and wine; and that the defendants are not entitled to any claim or set-off for any general average.