JOHN E. BOTSFORD ET AL. V. CHARLES H. PLUMMER.

*Shipping—Authority of master of vessel—Necessity.*

1. A master of a vessel is the agent of the owner, and as such author-
ized to act in all matters within the scope of his employment;
but where the owner is present, or within easy access, such
agency as is founded on *necessity* disappears, and no *necessity*
can be sufficient if the owner be so near that the master is not
obliged to act without instructions.

2. It is within the ordinary scope of the employment of the master
of a barge navigating the Great Lakes to enter into an agree-
ment for towage of his vessel to the port of its destination; and
if the vessel becomes water-logged *at sea,* or otherwise in
extremity or peril, he has authority to and may do whatever in
the emergency becomes necessary for the safety and protection
of his ship and cargo which a reasonable man would be required
to do under the circumstances.

3. The master of a vessel laden with lumber, sunk at the dock and
not in a navigable condition, the owner of both vessel and cargo
being close at hand and within easy telegraphic communication,
has no authority to contract for the towage of the vessel and
cargo to a distant port; such voyage being attended with great
peril, and the price agreed to be paid being exorbitant, when
compared with the value and price of towage for vessels in a
navigable condition.

Error to Saginaw. (Gage, J.) Argued June 22, 1887.
Decided October 20, 1887.

Assumpsit. Defendant brings error. Reversed. The
facts are stated in the opinion.

*Tarsney & Weadock,* for appellant.

*Avery Brothers,* for plaintiffs.

CHAMPLIN, J. Plaintiffs were owners of the steam-propel-
ler City of Concord; plaintiff Hebner being master and part
owner.

Defendant was the owner of a tow-barge, registered as the Saginaw, and resided at East Saginaw. The port of registration of both vessels was Port Huron.

The plaintiffs allege in their declaration that on June 4, 1884, they were the owners of the steam-propeller City of Concord, and that defendant was the owner of the barge Saginaw, and on that day the defendant, in and by his agent and representative, A. J. Helbing, duly authorized for that purpose, agreed and undertook with plaintiffs to immediately pay them the sum of $500, in consideration that plaintiffs, with and by their said propeller, would tow and transport said barge Saginaw from Port Crescent, by the usual routes of travel, to the city of Cleveland, in the state of Ohio; that they did tow, transfer, and transport said barge with their said propeller, by the usual routes of travel, from Port Crescent to the city of Cleveland, and in all things kept and performed the contract on their part, but the defendant refused to pay, etc.

The common counts in assumpsit are added, under which a bill of particulars was furnished.

The defendant pleaded the general issue, and gave notice that if the work, labor, and material were furnished, payment for which was sought to be recovered, they were so done and furnished under a special contract by which the plaintiffs agreed to tow the barge Saginaw from Port Crescent to Cleveland, and safely deliver said barge, with her cargo, safe at the dock for which the barge was destined; that they wholly failed to perform, and left the barge outside the light off Cleveland in the lake, and in a place of danger, subject to the mercy of the wind and water, and a tug had to go and rescue said barge, and complete the work begun by plaintiffs, for which defendant had to pay $150; that on account of their failure to perform their contract the barge Saginaw was detained in Lake Erie a long time, and was damaged, etc.

Defendant also gave notice that he would show that plaint-

iffs libeled said barge for their said claim in the district court of the Northern district of Ohio, and obtained judgment, and sold the vessel, and appropriated the proceeds to the payment of the claim.

It appeared upon the trial that the defendant, in May and June, 1884, was the owner of the barge Saginaw, the value of which was about $1,200; that she had a gross tonnage of 311.92, and was engaged in the lumber trade, with A. J. Helbing as her master.

About the twenty-second of May, 1884, the owner of the Saginaw agreed with George W. Morley, who resided at East Saginaw, to transport a cargo of lumber belonging to Morley from Port Crescent to Cleveland. Thereupon he instructed the master of his barge Saginaw to proceed to Port Crescent, take on the lumber, and get out into the lake, where he could catch some tug, and go into Cleveland. Accordingly the Saginaw, in charge of A. J. Helbing as master, left Bay City in tow of the steam-tug Jennie Sutton, and went to Port Crescent, which lies on the south shore of Saginaw Bay, about 50 miles from Bay City by water, where the master proceeded to load her with lumber. After lying at the dock at Port Crescent two or three days, and while the barge was being loaded, a storm arose on the lake, Huron, which somewhat interfered with the work. This dock is about 600 feet long, and vessels lying at the dock are considerably exposed to storms from the east and north-east. At the time the storm commenced to blow, the master had taken on board the barge about 340,000 feet of lumber. The storm lasted three days, when they continued the loading of the vessel. About this time the master observed that his vessel had sprung a leak, which could not be relieved by pumping. The master then dropped the barge around the end of the dock, and back towards the shore, and let her sink to the bottom in about 10 feet of water. She lay in soft sand and mud.

Port Crescent was at that time connected with East Saginaw by telegraphic communication and also by mail. The distance by mail route was about 80 miles. On the twenty-ninth of May, the master sent the following telegram to the defendant, viz.:

"PORT CRESCENT, MICH., 29 May, 1884.
" *To C. H. Plummer:* Send tug Parks and steam-pump at once to take me to Cleveland. Am full of water, and can't pump out.
"A. J. HELBING."

—Which was received by defendant the same day, and the following dispatch was returned on the thirty-first, viz.:

"EAST SAGINAW, May 31, 1884.
" To CAPT. BARGE SAGINAW,—
" *Pt. Crescent:*
" Stop expenses.   I will send boat to tow lumber to Cleveland.   Will write you particulars.
"C. H. PLUMMER."

On June 1 he wrote the following letter:

"EAST SAGINAW, MICH., June 1, 1884.
"A. J. HELBING, ESQ.,
" Port C.esent, Mich.,—
" *Dear Sir:* You can deliver your lumber to any boat that will take it from you at $1.50 per M.   It will be handier than taking it from the docks as you did.   After talking with parties here and at Bay City, do not think best to send pump and tug to take you to Cleveland, as this would be unsafe all around, I think.   I don't want the boat stuck for costs.   And get her back to Bay City as cheap as possible, and then I want to see you about some repairs.   If too expensive, leave her where she is, and come up; or I will come down there after I come home.   I go to Chicago to-night; back Tuesday or Wednesday.   I am sorry this thing happened.   I think you had better get boat to place of safety, if possible, as the wind may shift and stave you up.   Please attend to this at once.   I have tried to find the barge 'Joseph' to come and take your lumber; but may not be able to do so.   If tug comes there for your lumber, try and have them fetch you to Bay City.
" Yours truly,
"C. H. PLUMMER."

The master received the telegram on the thirty-first of May, and the letter on the second of June, before the arrival of the tug Concord at Port Crescent. On the fourth day of June, 1884, the tug Concord arrived at Port Crescent. She had been engaged in carrying salt from Lake Huron ports to Lake Erie ports for the Michigan Salt Association, and came into port to receive a cargo of salt for Toledo. The master of the Concord was Frank Hebner. The weather was fair. He found the barge Saginaw in a water-logged condition, lying alongside of the dock. The master of the Saginaw wanted to make arrangements with him to tow her to Cleveland. At first he refused to do so; but later in the day he agreed with the master of the Saginaw to tow him to Cleveland harbor, and deliver him to a tug there, for $500, and the following document was signed and delivered to the master of the Concord, viz.:

"$500.                    PORT CRESCENT, June 4, 1884.
"To Owner, C. H. PLUMMER, Master, and Cargo of Lumber of the Tow-barge SAGINAW, of East Saginaw,
                    "To Propeller CITY OF CONCORD, Dr.
    "For towing from Port Crescent, Mich., to Cleveland, Ohio, five hundred dollars.
                    "Master:   FRANK HEBNER.
    "Correct.
                    "A. J. HELBING, Master.
    "(Water-logged, and lying on the lake shore in an exposed condition.)"

The owner of the cargo resided at East Saginaw. The master of the Concord made no inquiry as to the condition of the large Saginaw, and did not go on board to examine her; neither did he make any inquiries of her master as to whether he had notified the owner of her condition, or had received any instructions from him.

The barge Fred J. Dunford was a consort of the Concord, and was lying at Port Austin. The Concord took the Saginaw in tow, proceeded to Port Austin, and here he took in tow also the Dunford, and proceeded to Toledo. When off

that port he dropped the Dunford, and towed the Saginaw to a point off the harbor at Cleveland, where he delivered her to a tug. She was towed to the place of her destination in a damaged condition, where steam-pumps had to be employed to keep her afloat while she was unloaded. The master entered a protest at the port at Cleveland, and refused to deliver the lumber to the consignee until he had paid the freight, amounting to $384, and $250 extra expense on account of water-logging.

The defendant refused to pay the $500 on presentation of the draft, and the plaintiffs, on the eleventh day of June, 1884, instituted proceedings against the boat in the district court of the United States, under which she was condemned and sold, together with her furniture, tackle, and apparel, from which was realized, over and above the costs of the proceedings, $25.38.

I have stated the facts at considerable length in order to fully present the points raised. The first and main point which I shall consider is, was the contract entered into between the masters of the vessels for towing the barge to Cleveland valid and binding on the owner of the barge Saginaw? The answer to this question must depend for its solution upon the authority of the master of the barge to make the contract under the circumstances. The circuit judge charged the jury upon this question as follows:

"Now, I charge you as a matter of law, gentlemen of the jury, that the captain of the barge Saginaw, as master of the barge, had a right to contract for the towing of that barge from Port Crescent to Cleveland; that it was within the scope of his employment. It was, as I have before remarked, a boat that was intended to be towed. It was propelled in no other manner, and it was within the scope of his employment to employ a tug or steamer to tow her. That she was partially filled, I don't think changes the scope of his employment at all,—that is, the authority to contract for towage; and this is independent of any special instructions from the owner, he having the right as master, and it being

within the scope of his employment as master of a tow-barge, to contract for towage. It was not necessary that Captain Hebner, in contracting with him, should make any inquiry of him, or any one else, as to whether he had the right to contract or not, because that was a right that he had as master, on these lakes, with reference to that class of boats. We cannot say that he had the right when the boat had no water, and that the right ceased when she had water, in her; because there is no point where we can draw the line. If he had a right as master to contract for the towing of his barge when it was rid of any water, he had the same right to make a contract with any amount of water in her; provided, of course, that the contract was made in good faith, and for the purpose of carrying out the objects and purposes of the voyage, or of taking care of the property and cargo intrusted to his care. He had no other means of locomotion.

"If the letters and telegrams that were sent to him by Mr. Plummer would not authorize him to make a contract to tow the boat to Cleveland, it was his duty to communicate the instructions that he had to Captain Hebner, and not Captain Hebner's duty, at that time, as manager of the steamer Concord, to inquire whether he had any special instructions or not."

The duties and powers of masters of vessels are, for the most part, pretty well recognized, and the law governing them settled. It is, however, impossible to define all their duties in advance, as they must depend upon, and are governed by, particular exigencies as they arise, and must be defined by the circumstances of each case. But the authority of the master lies within well-defined limits, and, resting upon ascertained principles, is for the most part measured by exact rules.

He is the agent of the owner, and as such authorized to act in all matters within the scope of his employment. It was held in *Pope v. Nickerson*, 3 Story, 465, 475, that the master has no more authority to bind the owner of the ship than any other agent to bind his principal; and it was said in *Mitcheson v. Oliver*, 5 El. & Bl. 419, 32 Eng. Law & Eq. 219, 232, that he is not the general agent of the owners.

In determining the authority of the master in ordinary cases, we must look to the general principles governing the law of agency.   But there are exceptions to the rule, depending upon the recognized customs and usages which have grown up in connection with maritime pursuits.   Thus, it is well settled that where the owner is himself present, or within easy access, that agency of the master which is founded on necessity disappears, for the necessity ceases to exist. No necessity can be sufficient if the owner be so near that the master is not obliged to act without instructions.   1 Pars. Mar. Law, 380, 381; *The Tribune*, 3 Sum. 149; *The C. M. Titus*, 7 Fed. Rep. 826.

Capt. Hebner of the Concord testified that he asked Mr. Helbing who the owner of the barge was, and put it upon the draft; that he did not inquire into the responsibility of Mr. Plummer, because he considered that he had the boat, and several thousand dollars' worth of lumber there in the boat; that Mr. Helbing told him where the owner lived; that he knew there was a telegraph office in Port Crescent, and one in East Saginaw; that he made no inquiry of Capt. Helbing as to whether or not Mr. Plummer would consent to his bargain, and made no inquiry as to whether the owners of the lumber in the boat knew of this bargain, or would consent to it.

He further testified that the barge was in bad sea-going condition; that in going from Port Crescent he had difficulty with the barge Saginaw; that she steered bad,—in fact, going out of Port Austin, he had to check his boat down, as she was going first one way and then another, as far as the line would let her; that when he first saw the barge lying at the dock she was laden with lumber, water-logged and sunk; that the lumber could have been unloaded again upon the dock with safety; that after the contract was made he told Capt. Helbing that he must discharge a part of her cargo, so as to light her

in order to start her; and it appears that about 100,000 feet was then unloaded from her deck.

Capt. Hebner also testifies that it is not safe towing water-logged vessels, nor a common practice, but that if they were left in a place of safety, some harbor, he should think the better way would be to pump them out until they were in good condition; that, while he has known of water-logged vessels being towed several times to be left in a place of safety, this is the first time that he ever knew of a contract being made with a water-logged barge at the dock to tow it to another place. His experience as a sailor dates from 1858 or 1859.

Capt. Elisha Ames was a witness produced by plaintiffs. He was a mate on the City of Concord. He has had 26 years' experience in sailing, mostly upon steam-boats. He was asked by plaintiffs' counsel this question:

"*Q.* What do you say was the custom, on those waters, of masters making contracts for towage?"

His answer was:

"*A.* The Saginaw, lying at Port Crescent, was not at a place of safety, in the ordinary meaning of the term."

On cross-examination he testified that this was his first experience in towing a water-logged vessel, and he never knew of a case of taking a barge loaded with 260,000 feet of lumber in a water-logged condition.

Capt. William Hutchison, a witness for plaintiffs, had followed the business of sailing for 14 years on tugs and steam-barges, 8 of which was on tugs. He never had any experience in making contracts with masters whose barges were water-logged. Afterwards he was recalled, and testified that he did find one little water-logged vessel off the point at one time, but it was abandoned; and he went and picked her up, spent two or three hours, and got $125 or $150. And he

remembered another instance at South Manitou, in Lake Michigan, where he made arrangements with a captain to get him off the beach, and tow him to Milwaukee, a distance of 150 miles, for $1,200. He never took a water-logged vessel from the dock at which she received her cargo.

Capt. Allen Fick, sworn for plaintiffs, testified that he had been sailing steamers and vessels since 1873; that he had sailed tugs, and the custom on the lakes in respect to making contracts with barges is generally with the masters,—that is, when the boats are in good condition; that he never made a contract with the master of a boat that was loaded and water-logged at the dock, to tow it any distance; that the only contract he made with the master of a water-logged boat was when it was out in the water of the lake, where it could not be secured in any other way.

Capts. Young and Stevenson also testified to the custom of making contracts for towage with the masters of barges, whether they were in good or bad condition, and each testified that he never knew of an instance where such a contract was made with the master when the vessel lay at the dock where she was laden and water-logged.

It is within the ordinary scope of the employment of the master of a barge navigating the Great Lakes to enter into an agreement for towage of his vessel to the port of its destination; and if his vessel becomes water-logged at sea, or otherwise in extremity or peril, he has authority to and may do whatever in the emergency becomes necessary for the safety and protection of his ship and cargo which a reasonable man would be required to do under the circumstances.

But the circumstances in which the barge Saginaw was placed when the contract in question was entered into were exceptional. She was not at sea or in port in a navigable condition. She was lying at the dock water-logged, and sunk upon the bottom of the lake. She could not be kept afloat

except from the buoyant character of the cargo. To take her in tow was at the peril of both vessel and cargo. Disaster had not overtaken her upon her voyage, but while she was in port before she had set out upon her voyage. The owners of both vessel and cargo were close at hand, and might have been communicated with, and the owner had in fact been communicated with, and had given instructions to the master. In these instructions he is expressly told that the owner did not think it best to send a pump and tug to take the vessel to Cleveland, as this would be unsafe all around. The boat could have been unladen where she was, and the lumber put back upon the dock, or upon the beach, in a place of safety.

I am aware that testimony was offered to show that the mill-owner at Port Crescent desired the space from which the lumber was taken upon which to pile other lumber, and also to the inconvenience he would have been put in the use of his tramways for unloading the barge. But these considerations did not enter into or influence the parties to make the contract they did. Indeed, I do not see how they could be material. Were the plaintiffs putting forth a claim for compensation in the nature of salvage, these circumstances would have a bearing upon the peril in which the vessel was placed.

This is not an action to enforce claims for salvage; and it is therefore wholly immaterial whether the vessel was in distress, actual or immediate, or whether the danger to her was imminent, or whether she was exposed to injury or destruction if the services were not rendered. The case we are to consider is simply a contract for towage, and whether such contract was authorized by the owner under the circumstances.

This contract was to tow this water-logged vessel from where she lay laden and at port, sunk upon the bottom, to her port of destination. The testimony shows that the vessel and cargo would incur great peril in being towed that distance, it being in the neighborhood of 275 miles; and I have no hesitation in saying that, under the circumstances of the

case, the authority of the master did not extend to making the contract declared upon and proved in this case. When the idea of salvage is excluded, the circumstances show that the contract was not made in the ordinary scope of the master's employment.

The circumstances were extraordinary, and not usual, and were such as called upon the master of the Concord to deal with him at his peril, if he did so without ascertaining his authority. He knew that the barge was water-logged and aground; that she was lying at the dock where she was laden; that the owner of the vessel was within convenient reach, and could be communicated with by telegraph. He knew that the price he asked, and which the master of the barge agreed to pay, was exorbitant, when compared with the value and price of towage for vessels in a navigable condition; the value of services for towing under ordinary circumstances being one-sixth of the freight, which in this case would have been $64, while the contract price was $500.

Was he justified in relying upon the general authority of the master to make contracts for towage under ordinary circumstances? I think not. The circumstance, as before stated, were extraordinary, apparent, and known to Capt. Hebner. He must look, then, for such authority of the master as has its origin in the necessity of the case. But here he is met with the principle that, where the owner is within easy access for communication, the agency of the master founded upon necessity disappears. And I think it was the duty of the master of the barge to act upon the instructions already given after the emergency had arisen, or to have obtained fresh instructions from the owner before entering into the contract; and also that it was the duty of the master of the Concord to inquire and ascertain the extent of the authority of the agent to enter into the contract in question.

Upon the main point in the case which I have discussed, I

think the learned judge erred in his charge to the jury as above quoted.

There was testimony in the case from which the jury might have inferred a ratification by defendant, but it was not submitted to the jury upon that theory. If the master of the barge Saginaw collected from the consignee $250 extra towage performed by plaintiffs on account of the water-logged condition of the boat, and defendant has received that money, or any part thereof, or, having knowledge of that fact, has adopted or confirmed such act, he is bound by the contract made. 1 Pars. Mar. Law, 387, 388.

Attention is called to the second question submitted to the jury, and their answer thereto. The question was as follows:

" Were the master of the barge Saginaw and the master of the Concord so situated as to have communication with the owner of the barge Saginaw by telegraph or daily mail, or both, if they desired?"

The jury answered, " No."

Criticism is made respecting this answer in the light of the undisputed testimony that there were both telegraphic communication and daily mail between Port Crescent and East Saginaw. The answer, however, becomes unimportant under the charge of the court which was founded upon the contract entered into between the masters of the vessels. He charged them that the master had authority to bind the owner by the contract in question, whether the owner was in reach of communication or not, and, if the contract was reasonable, it was valid.

The judgment should be reversed and a new trial granted.

The other Justices concurred.