## RICHICHI et al. v. JAMES B. DRAKE & SONS et al.

### (District Court, D. Maine, S. D. May 2, 1922.)

### No. 726.

**1. Shipping ⬅⬇35—Captain in foreign port held to have no implied authority to charter vessel.**

A captain of a vessel in a foreign port, in easy cable communication with the owners, has no implied authority to bind them by a charter of the vessel.

**2. Shipping ⬅⬇39—Contract of master construed as to its binding effect upon owners; "fixed."**

A charter entered into by captain of ship, containing the condition, "Provided ship not fixed previously," *held* not to bind the owner, if unable to perform by reason of any contract or condition under which the vessel would not be free to be used to carry out the charter, and which were unknown to the captain; the word "fixed" being equivalent to "tied up," "closed," "not free."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fixed.]

In Admiralty. Action in personam by Giovan Battista Richichi and another against James B. Drake & Sons and others, as former owners of the schooner James B. Drake. Judgment for defendants.

Gerry L. Brooks, of Portland, Me., for libelants.

J. F. A. Merrill and N. W. Thompson, both of Portland, Me., for defendants.

PETERS, District Judge. This is an action in personam brought by Richichi & Figli, of Trapani, Italy, against the former owners of the schooner James B. Drake, to recover damages for the failure of the owners of the schooner to carry out the terms of a charter party signed by the master of the vessel on behalf of the owners, while in Trapani with his vessel, in February, 1916.

I find the following essential facts:

The defendant corporation, James B. Drake & Sons, was at the time in question, and had been previously managing owner of the schooner James B. Drake, which was owned by James B. Drake & Sons and a number of individuals residing in different parts of the New England states. The schooner James B. Drake was, at the time in question, in command of Jason C. McKown.

The vessel was chartered late in 1915, for a trip from Norfolk, Va., to Trapani, Italy, with lumber returning with salt to Gloucester, Mass.

From January 7 until February 20, 1916, the Drake was in Trapani, unloading lumber, loading salt, and waiting for favorable weather. On February 20th she sailed for Gloucester.

While at Trapani Capt. McKown was in easy communication by cable with the managing owners in Bath, Me., and did, as a matter of fact, exchange frequent cables with them.

While at Trapani the captain opened negotiations with the plaintiff Richichi, looking toward carrying a cargo from the United States to Italy, after his return to the United States.

⬅⬇For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On February 3d the captain wrote Richichi asking for an order for such a cargo. Evidently Richichi telegraphed from Palermo to the captain, as, on February 6th, the captain wrote him giving prices on lumber from Pensacola and saying:

"* * * I would want to take cargo from Boston, or nearby port, to Pensacola or some nearby port, that is coal or some quick cargo, as could go more quickly; also, want in charter (provided vessel not closed previous), so that, if anything has been done at home and I have not been informed, we would be released. This is only for safety. I am bound to Gloucester, Mass., with the salt, and will get away about next Sunday."

Capt. McKown had no express authority to charter the vessel, and was seeking this business on his own initiative. On February 12th he cabled to the managing owners, at Bath, that he had been offered $15 freight from Baltimore to Italy. The managing owners immediately cabled back to the captain: "Do not charter." This cablegram was sent by the captain, and reply was received by him inside of about 24 hours, and on February 12th the captain wrote to Richichi as follows:

"Trapani, February 13, 1916.

"Mr. Antonio Richichi, Palermo—Dear Sir: I have just received a telegram from home; and, at the present time, can do nothing as they think rates will be higher. If you write to Mr. Drake, you may do some business a little later. I will sail Tuesday for Gloucester, Mass. Would like very much to come to Palermo.

"Yours very truly,          Jason C. McKown,
"Master Schooner James B. Drake."

On the 18th of February Capt. McKown signed a charter party with Richichi, whereby it was agreed that the schooner Drake, after her voyage to and discharge of salt at Gloucester, should proceed to Pensacola, or some Gulf port, and load with lumber for West Italy, on certain terms specified in the instrument, which was signed:

"Jason C. McKown, Master,
"Agent for Owners.
"Ant. Richichi & Figli."

At the end of the printed portion of the charter, and before the signatures, the following words were inserted:

"Provided ship not fixed previously."

On February 19th, Capt. McKown wrote Richichi, among other things:

"In regard to charter of to-day, will say that I think better not to have but one port of discharge. * * * I have wired Mr. Drake that I have closed, subject to not being fixed previously. Will sail first chance, and hope to hear from you at Gloucester, Mass. Be sure to get everything in that charter which will help us out, as you know lumber is a slow cargo. * * *"

On February 20th, the day Capt. McKown sailed, he also wired the managing owners as follows:

"Tripani, February 20, 1916.

"Drake: Sailing chartered conditional lumber Gulf Italy seventy dollars standard.          McKown."

On March 5th Richichi cabled the managing owners as follows:

"Palermo, March 5, 1916.

"James Drake, Bath, Maine: Have Capt. McKown communicate you 'fixare' Drake Pensacola West Italy wire.                          Richichi."

In the confirmation of this cable, the word "fixare" appears to be "fixure."

The following reply was sent by the managing owners:

"March 6, 1916.

"Richichi, Palermo, Italy: No. We have sold Drake.        Drake."

In subsequent communications between the parties it was claimed on the one hand that the charter party was binding, and on the other that it was not. The respondents repudiated the charter party when it was brought to their attention.

While the master of the vessel in Italy was arranging for a charter, the owners of the vessel in this country were arranging for a sale, had given options, and, on February 9th, while negotiating for a sale of the vessel, they gave one Hobbs, of New York, an opportunity to charter the vessel, if not sold.

Before the vessel arrived in this country, negotiations for a sale had been consummated by a deposit of money, and bills of sale were subsequently executed.

It appears that, on May 1, 1916, Richichi assigned the charter to Rosasco Bros., of Pensacola; that Rosasco Bros., agreed to load the vessel with pine and pay a sum in addition to the charges called for in the charter. The respondents were notified of the transfer of the charter, and directed to have the schooner proceed to Pensacola to carry out its terms. The respondents refused to permit the vessel to be used for that purpose. It is alleged that Rosasco Bros. claimed and recovered damages of the libelant to the amount of $20,000, which increases the claim of the libelants against the respondents to about $42,000, for the failure of the owners of the vessel to permit her to be used for the purposes specified in the charter.

On March 15, 1917, Rosasco Bros. reassigned the charter to Richichi before this action was brought.

The managing owners of the vessel had only two possible agents in Trapani—one, a bank, for the purpose of collecting and forwarding freight; the other, the master of the vessel. Neither had any authority to charter.

The principal executive officer of James B. Drake & Sons, managing owners, was called as a witness by the libelants, and was questioned concerning the authority of the bank in Trapani:

"Q. Did they have any authority to enter into any charter?

"A. No. Nobody did.

"Q. No one outside of your own firm?

"A. No one had any authority to charter our vessels at all; outside of ourselves."

It not being now questioned that the master had no express authority to charter the vessel, it is claimed by the libelants that he had implied authority to do so, by reason of the fact that the ship was in a

foreign port at a place where the owners had no agents expressly authorized to enter into chartering contracts.

A preliminary question, however, is whether the master did attempt in the charter to bind the owners, regardless of any contracts they might have made concerning the vessel. This brings up the question of the meaning of the words, "Provided ship not fixed previously," inserted by the parties in the charter party. It is contended by the libelants that this means provided the ship was not "chartered" previously. And, as bearing on this, they quote from a letter which, as a matter of fact, was written by the master to the managing owners the day after he signed the charter, and in which, among other things, he said:

"I * * * closed conditionally lumber from Gulf to west coast Italy. * * * I hope, if the vessel is not chartered, you will be pleased with this freight. * * * *"

It does not appear whether or not the captain knew of the negotiations for sale that were going on in this country, but the language used by him was broad enough, and sufficiently apt, to cover a sale, or an option to buy, or an option to charter, or any contract condition the existence of which would prevent the vessel being free. If the language used had been intended to cover a charter only, it would have been very simple to have said:

"Provided ship not chartered previously."

Nowhere in his correspondence with the libelants did the master, in relation to this contract, refer to the vessel being chartered previously. In one of his first letters to Richichi, that of February 6th, the master said:

"Also want in charter (provided vessel not closed previous)."

Apparently the captain used parentheses for quotation marks, and expected that the above, or equivalent language, would be put in the charter party. The word "fixed" was subsequently used, instead of "closed."

In the letter of February 6th, above mentioned, the captain goes on to explain to Richichi the purpose of the proposed clause in the charter, "Provided vessel not closed previous," and says:

"So that, if anything has been done at home, and I have not been informed, we would be released."

This does not limit the condition at home to a chartering. He says, if "anything" has been done at home, they would be released.

This language that the captain used to the libelants is more important than the language in his letter to the owners, in which he spoke of only one condition that might prevent the charter being fulfilled. It was not necessary to be so explicit with the owners as it was with the third parties. It is what the libelants had a right to rely upon that is important.

[1, 2] It seems quite clear, in view of all the circumstances and the correspondence, that the parties intended the exception in the charter party to cover any condition which might exist in America, due to contracts made by the owners, unknown to the captain, under which

the vessel would not be free to be used to carry out his charter with Richichi.

The word "fixed," having no technical signification, roughly used in this way in a contract between a sea captain and a foreign firm, is quite clearly equivalent to "tied up," "closed," "not free"—in other words, "prevented from performing the contract on account of other contracts previously made by owners."

From the view that I take of the case, however, the libelants could not prevail, even if the condition had been omitted from the charter party.

This is a case of agency. The captain had no express authority to charter the vessel. The managing owners had, by cable message, ordered him not to charter her. The libelants urge, however, that the captain, under the circumstances, had authority implied by law to bind the owners. They earnestly contend, through their counsel, that the master of a ship in a foreign port, where the owners do not have a known authorized agent, has authority to enter into a charter party binding the owner.

The learned counsel for the libelants, to sustain their contention, cite a line of authorities running back, as they say, into the Middle Ages for its foundation. If this case had been tried in the Middle Ages, possibly the libelants might have recovered, although it is at least doubtful whether, even then, or ever, the master had implied authority to charter his vessel while in a foreign port, to run from his home country after an intervening voyage. That was the case here. The captain of the vessel, while in a foreign port, attempted to make a charter to commence after the vessel returned to America, and made another trip from Massachusetts to Florida.

In Scrutton on Charter Parties and Bills of Lading, p. 33, the author says:

"Before the arrival of his ship in port no captain has any authority in law to bind his owners by letters written to an agent in port asking him to make a charter of the ship before its arrival; and a charter so made would not be binding on the owners, unless subsequently ratified by them."

Whatever authority the master had in olden times to charter his vessel in a foreign port, without knowledge or permission of his owners, was based on a rule that was evolved from the exigencies of the situation. Not being able to communicate with his owners, and the ship being entirely beyond their control, sent out to engage in the commerce of the world, the master was what might be termed an agent by necessity, and when the necessity ceases the rule falls. In these times —at least in a case like this—when a master is in easy and frequent communication by cable with the owners, there is no necessity or reason to rely upon implied authority and none can be invoked. The communication was so easy in this case that, so far as making contracts for the future business of the vessel was concerned, she might as well have been in her home port, and it will hardly be claimed that there the master has implied authority to bind the owners by such a contract. In The Tribune, 3 Sumn. 144, 149, Fed. Cas. No. 14,171, Story, J., says:

"As to his right to make such a contract in the home port of the owners, I agree, that it cannot be ordinarily presumed from his character as master. It is not incident to his general authority; nor can it be presumed, under such circumstances, as an ordinary superadded agency."

In Botsford v. Plummer, 67 Mich. 264, on page 271, 34 N. W. 569, on page 572, the court said:

"Thus, it is well settled that where the owner is himself present, or within easy access, agency of the master which is founded on necessity disappears, for the necessity ceases to exist. No necessity can be sufficient, if the owner be so near that the master is not obliged to act without instructions."

Several other defenses of more or less merit have been interposed in this action, but it is unnecessary to consider them, in view of my conclusion that the master had no authority, either express or implied, to execute this contract.

The entry will be:

Judgment for defendant, with costs.